HITACHI MEDAL VERSUS UNITED STATES. THE INTERNATIONAL TRADE COMMISSION IS TASKED WITH EVALUATING THE IMPACT OF IMPORTS ON AN INDUSTRY. NOTHING IS MORE FUNDAMENTAL TO THAT INQUIRY THAN THE DEFINITION OF THE INDUSTRY. THE STATUTE DEFINES INDUSTRY AS THE PRODUCERS OF A WHOLE OF THE DOMESTIC-LIKE PRODUCT. THE STATUTE THEN GOES ON TO DEFINE WHAT IS DOMESTIC-LIKE PRODUCT. IT IS A PRODUCT THAT IS LIKE, OR IN THE ABSENCE OF LIKE, MOST SIMILAR IN TERMS OF CHARACTERISTICS AND USES WITH THE ARTICLES SUBJECT TO INVESTIGATION. I BELIEVE PART OF YOUR ARGUMENT IS THAT THE COMMISSION INAPPROPRIATELY ADOPTED A PRESUMPTION TYPE OF STANDARDS. IS THAT CORRECT? THAT IS CORRECT. DON'T YOU EXPLAIN? WHAT IS IT THAT THEY DID THAT YOU FIND OFFENSIVE? I ACTUALLY THINK THAT THE BEST ANSWER, YOUR HONOR, IS A QUOTE IN THE REPLY BRIEF FILED BY THE GOVERNMENT THAT ILLUSTRATES THE PRESUMPTION THAT WAS ADOPTED. THEY STATE, BECAUSE IMPORTS OF THESE TYPES OF PRODUCTS WERE NOT SUBJECT TO THE INSTANT ANTI-DUMPING OR COUNTERBAILING DUTY INVESTIGATION, SO WE HAPPEN TO BE ARGUING ABOUT A LIKE PRODUCT THAT SAT OUTSIDE THE SCOPE OF THE INVESTIGATED PRODUCT. WHAT IS THE PRESUMPTION THAT THEY STARTED FIRST BY LOOKING AT CONGRESS' SUBJECT MERCHANDISE DETERMINATION? THEY DO, YOUR HONOR, AND THEY GO ACTUALLY FURTHER, AND THEY SAY ANALYSIS OF ANY PRODUCT, IT IS, YOUR HONOR, BECAUSE THEY GO BEYOND AND THEY SAY ANY CONSIDERATION OF PRODUCTS BEYOND THE SCOPE OF WHAT'S UNDER INVESTIGATION IS SIMPLY IMMATERIAL TO THE DOMESTIC-LIKE PRODUCT ANALYSIS. SO WHAT THEY'VE DONE IS THEY'VE CONFINED THE DOMESTIC-LIKE PRODUCT ANALYSIS TO THE SCOPE. THEY'VE SAID WE'VE DEFINED THIS BOX OF PRODUCTS THAT ARE WITHIN THE SCOPE, AND WE DO NOT CONTEST THAT THEY ARE ENTITLED TO, ANY CONSIDERATION IS ENTITLED TO DEFINE WHAT THE SCOPE OF THE INVESTIGATED PRODUCTS ARE. THE TASK OF THE ITC IS THEN TO DECIDE, WELL, WHAT INDUSTRY DO THESE PRODUCTS THAT ARE SUBJECT TO INVESTIGATION FALL IN? THAT INDUSTRY COULD BE BROADER. IT COULD BE SUBDIVIDED INTO TWO. YOUR OBJECTION IS IN DEFINING THE PRODUCT THAT THE ITC LOOKS TO IN COMMERCE AS SUBJECT MERCHANDISE DETERMINATION. AND THAT THEY USE THAT AS AN ENDING POINT, NOT A STARTING POINT. BUT IT'S NOT IMPROPER THAT THEY STARTED THERE, CORRECT? OF COURSE. ACTUALLY, THE STATUTE MANDATES THAT THEY START THERE, THAT THEY ABSOLUTELY BEGIN THERE. SO WE KNOW THAT THAT'S NOT THE PROBLEM. THAT IS CORRECT. THAT THEY LOOK THERE FIRST. YOUR ARGUMENT IS THAT THAT'S THE ONLY PLACE THEY LOOK. THAT IS ABSOLUTELY CORRECT. THEY DID NOT MAKE THE SECONDARY, NECESSARY COMPARISON, WHICH IS TO SAY THAT THE DOMESTIC-LIKE PRODUCT IS THAT WHICH IS LIKE WHAT IS SUBJECT TO THE INVESTIGATION. IT IS NOT SIMPLY WHAT IS SUBJECT TO INVESTIGATION, IT IS WHAT IS LIKE SUBJECT TO INVESTIGATION. WHAT INDUSTRY DOES THAT FIT? AND TO GIVE THE... YOU'RE NOT ARGUING THAT THEY SIMPLY ADOPTED THE SCOPE OF A SUBJECT MERCHANTIZE AND THE LIKE PRODUCT DETERMINATION, CORRECT? I MEAN, THEY DID DO AN ANALYSIS. BUT THEIR ANALYSIS WAS CONFINED AND LIMITED TO THE SCOPE OF WHAT WAS ALREADY UNDER INVESTIGATION. THEY NEVER WENT THE NEXT NECESSARY STEP AND SAID, WELL, WHAT INDUSTRY DOES THIS SCOPE FIT INTO? FOR EXAMPLE, IF WE WERE... BUT THEY DID THAT AFTER THEY MADE THE LIKE PRODUCT DETERMINATION. I MEAN, YOU FIRST HAVE TO DETERMINE WHAT THE LIKE PRODUCT IS IN ORDER TO UNDERSTAND WHAT THE U.S. PRODUCING INDUSTRY IS. AND THAT IS THE CORE OF OUR ARGUMENT, THAT THEY NEVER DEFINED THE DOMESTIC LIKE PRODUCT. HOW WIDE IS THIS? WE SEE THE SCOPE. WE SEE A CONTINUUM OF STEEL PRODUCTS, FOR WHICH SEVEN... THEY DID DEFINE IT. THEY ADOPTED THE SCOPE OF THE SUBJECT MERCHANDISE UNDER INVESTIGATION THAT WAS DERIVED BY THE DEPARTMENT OF COMMERCE. THEY DIDN'T... IT'S NOT THAT THEY HAD A BLANK. THEY DID HAVE SOMETHING THERE. AND IT HAPPENED TO BE THE SUBJECT MERCHANDISE DETERMINATION OF COMMERCE. AND THEY LOOKED NO FURTHER THAN THAT. AND WE POINTED TO... IF THEY MAKE AN ANALYSIS AND SAY, WE NEED TO LOOK NO FURTHER, WE NOW DETERMINE THAT THE LIKE PRODUCT DETERMINATION IS CO-TERMINUS WITH THE SUBJECT MERCHANDISE DETERMINATION. WE NEED TO GO NO FURTHER. I MEAN, WHY IS THAT WRONG? BECAUSE THEY NEVER BOTHERED TO EXPLAIN HOW THE NARROW AND PRECISE DEFINITION THAT THEY USED IN THIS PARTICULAR CASE WAS DIFFERENT FROM THE PREVIOUS CASES, WAS DIFFERENT FROM SUBSEQUENT CASES, WAS DIFFERENT FROM 35 YEARS, WAS DIFFERENT FROM THE INDUSTRY THAT THEY HAD FOUND IN ALL THE PREVIOUS CASES. THAT'S ANOTHER ARGUMENT THAT YOU HAVE, AND THAT'S THAT THEY LEFT OUT A CERTAIN SEGMENT OF THE INDUSTRY THAT THEY SHOULD HAVE. AND IT'S OUR BELIEF THEY DID THAT, AND NOT CONSIDERING THE TOTALITY OF THE DOMESTIC-LIKE PRODUCT IN THE FIRST INSTANCE. SO IT IS, FOR EXAMPLE, IF THEY HAD FILED A PETITION ON RED BALLOONS, WE HAD ARGUED THAT, WELL, THE INDUSTRY HERE SHOULD BE ALL BALLOONS, NOT JUST SIMPLY RED BALLOONS. THEIR POSITION IS THEY DON'T NEED TO CONSIDER THAT BECAUSE THAT IS IMMATERIAL BECAUSE YELLOW BALLOONS ARE OUTSIDE OF SCOPE. AND OUR POSITION IS, NO. IN THE FIRST INSTANCE, YOU LOOK AT WHAT IS ACTUALLY BEING REQUESTED TO BE INVESTIGATED. WHAT'S THE SCOPE OF THE PETITION? NEXT STEP IS TO DETERMINE IN WHICH INDUSTRY DOES THIS FIT? IS THERE SUCH AN INDUSTRY AS RED BALLOONS OR IS IT BALLOONS? IN OUR CASE, IS THERE SUCH AN INDUSTRY AS TOOL STEEL OR IS THERE SUCH AN INDUSTRY AS CARBON AND ALLOY STEEL? WE RAISED THIS QUESTION BECAUSE PREVIOUSLY THE ANSWER TO THAT WAS NO. IT'S A SEPARATE INDUSTRY. IS IT A SEPARATE INDUSTRY? IS IT A LARGER INDUSTRY? TOOL STEEL HAD ALWAYS BEEN PART OF A SEPARATE INDUSTRY HISTORICALLY. THE CASES YOU CITE ARE ALL SAFECARD CASES OR OTHER TYPES OF CASES. THAT'S A DIFFERENT STANDARD. A SAFECARD STANDARD IS DIFFERENT. IT'S A DIFFERENT MEASUREMENT OF THE MERCHANDISE. IT'S A DIFFERENT TYPE OF RELIEF. IT IS AND IT'S OUR POSITION THAT THOSE CASES ARE NOT DISPOSITIVE BUT THEY CERTAINLY ARE INFORMATIVE. WE DEFER TO AGENCIES' EXPERTISE. STEEL IS AN INDUSTRY THAT THE ITC... YOU MADE THIS ARGUMENT BEFORE? ABSOLUTELY. AND THAT STEEL IS AN INDUSTRY THAT THEY HAD ANALYZED FOR THE PAST 35 YEARS. THEY HAD REACHED CONCLUSIONS. IT IS CERTAINLY INFORMATIVE AND HELPFUL AND MEANINGFUL TO THE ANALYSIS BECAUSE OTHERWISE YOU END UP WHERE WE ARE TODAY. WE HAVE CONTINUING RIGHT NOW BEFORE THE INTERNATIONAL TRADE COMMISSION AT LEAST THREE COMPLETELY SEPARATE DEFINITIONS OF AN INDUSTRY COMPRISED OF CUT-TO-LENGTH FLATE. ONE DEFINITION, CURRENTLY OPEN, JUST CONSIDERS CARBON AND STEEL. ANOTHER DEFINITION IS CARBON PLUS ALLEN. A THIRD DEFINITION IS JUST CERTAIN SUBSEGMENTS OF THOSE TWO. ALL OF THOSE THREE CASES RIGHT NOW ARE OPEN BEFORE THE TRADE COMMISSION. SO INSTEAD OF HAVING ONE COMMON DEFINITION OF AN INDUSTRY, OF AN INDUSTRY THAT I SHOULD SAY THE INTERNATIONAL TRADE COMMISSION HAS ANALYZED DEEPLY AND CONTINUOUSLY FOR 35 YEARS AND REACHED INFORMED JUDGMENTS ABOUT WHERE THE PARAMETERS OF THOSE INDUSTRIES ARE, YET CONTINUES TO CARRY ON CASE AFTER CASE WITH DIFFERENT DEFINITIONS OF INDUSTRY, WHICH SETS THE FUNDAMENTAL FRAMEWORK FOR THE ENTIRE INJURY ANALYSIS BEFORE THE TRADE COMMISSION. NOTHING CAN PROCEED WITHOUT THE DEFINITION OF INDUSTRY. AND IT'S OUR POSITION THAT THE FATAL FLAW IN THEIR ANALYSIS IS A DE FACTO PRESUMPTION THAT MY PRODUCT OR INDUSTRY FOLLOWS SCOPE. AND IT'S OUR POSITION THAT THERE ARE... IT SIMPLY DOES NOT. IT BEGINS WITH SCOPE. OF COURSE WE NEED A REFERENCE POINT, AND THE STATUTE CLEARLY REFERENCES THAT. Didn't they consider, in their opinion, and I'm looking at page, for example, 2099 to 2100, I mean, there they do go through the six-factor analysis, don't they? They do, but unfortunately their six-factor analysis is confined to what is within the scope. So they have identified a scope. Is it confined to what was argued before then? It was absolutely not. Our fundamental argument at the hearing and the presentation, and I simply did it myself, so I'm very familiar with it, was tool steel is much like stainless steel. That was principally our argument. So you need to consider us as part of that group. Do what you do with this larger stainless steel family, because we are even more different than carbon steel from stainless steel. That was the essence of our argument. They never did that. They never looked and said, well, we are taking stainless steel and we've removed it from this investigation. We have not found it to be part of this industry. And our position was if that is true for stainless steel, why is the same not true for tool steel? If you've carved out a piece and we're most similar to the piece that you've carved out, how do we not? Your complaint is that they didn't go through the six-factor analysis with respect to an explanation of why stainless steel is carved out and yet tool steel is still in? That is absolutely correct. That was the core of our analysis. And that flaw arises because they simply began with scope, ended with scope in defining the industry, and there was no meaningful analysis to determine, well, what is like the product? I feel like I'm missing something in your argument, because you keep on saying they started with scope and ended with scope, but I look at their discussion and it's for multiple pages and it goes through those different factors, so I feel like I must be missing something. So all of those factors in the entirety of that analysis is limited to what was covered by the scope of the investigation. It's limited to the product subject to investigation. That was the limiting factor. It never looked at holistically first. So in other words, you're saying that they should start looking outside of that. You first have to look outside of that. I thought you said you have to start with the definition of the scope of the investigation. You do, and then the statute requires finding out what is like those things. Are yellow balloons like red balloons? I can bring up a case and I can have as my scope red balloons. But is my industry, my injury analysis, is that all balloons or is that just red? And they stayed with red. That's effectively what they did. And our primary position was that first you need to decide what is like the things you're investigating. Alloy steel was included within scope. Did anybody argue that stainless steel was like a like product? Our argument was we were like tool steel was like stainless steel. But there was nothing to suggest that stainless steel was a like product. Nobody ever suggested that. I'm just trying to understand how the proceedings were. Your argument was we're like stainless steel. They're not a like product. Therefore, we're not a like product. But you're saying that if nobody ever argued that stainless steel was a like product, I'm just wondering like in the course of litigation, for example, usually when a court is trying to make a determination, and it's probably the same with the agency, they're looking at the input that they're receiving, and they're looking at the arguments that are being made before them. And that is something that informs the scope of their analysis. So I'm just wondering, how does that factor into this? That is when we went into the extensive 35-year history of analysis showing that stainless steel had been historically a separate like product. All these products, where these lines were in the steel industry. And this is your established practice argument, that there was an agency practice. That is exactly right. That stainless steel was a different like product. Stool steel was a different like product. And we went through the history of all the steel cases of where these lines were historically. Counsel, do you want to take time for rebuttals? I would. Thank you very much. How do I pronounce your name? Is it Soyseth? Soyseth. Yes, Your Honor. May it please the Court. Brian Soyseth representing the U.S. International Trade Commission. As Counsel just stated, scope is the starting point for the Commission's like product analysis. I think what's key here is that Counsel is focusing on products that were not part of that starting point. They're focusing on these products that were excluded from the scope. Like stainless steel. Like stainless steel. Specifically excluded. That's one of the products explicitly excluded, correct, Your Honor? Right. And so that is the reason they were not in the Commission's starting point. And to follow up on your point, Your Honor, no party argued that they should be included in the Commission's definition of like product. No party requested that the Commission define the like product more broadly than Commerce's scope regarding stainless steel or anything else. Indeed, before the Commission, Counsel Hitachi argued the opposite, that these excluded products are not like the other articles that were described in Commerce's scope. If you look to pages 1266 to 1269 of the Joint Appendix, you'll see Hitachi's brief before the Commission in which they are, yes, they're arguing that tool steel is similar to stainless steel and other products, but they're also emphasizing differences between stainless steel, these excluded products, and the other types of steel plate that were subject to Commerce's scope. And second, even if there are similarities between tool steel, stainless steel, and other excluded products, that's not the pertinent issue. The pertinent issue is whether there were clear dividing lines between tool steel and other articles that were like those described in Commerce's scope, meaning carbon steel plate and alloy steel plate. There are thousands of permutations of steel. But does Commerce have an obligation to independently determine what the domestic like product is? The Commission? Yes, Your Honor. That has never been a source of contention. Certainly the Commission does independently define the definition of like product. But I think, unless I'm wrong, his argument is that you instead started by just deeming it coextensive with the products covered in the scope of this. And, of course, that's not correct, Your Honor. We would disagree with that contention, and I think looking at both the preliminary determinations in which we initially examined whether there were distinctions between carbon steel plate and alloy steel plate, and this is not even an issue raised by parties. The Commission on its own acknowledged this was the first time it had examined these products together, and it undertook its own analysis. It undertook analysis for a different product as well, X70 plate. It's used in oil and gas transmissions. And then in the final determinations, the Commission also examined the issue presented by the respondents here, whether there were clear dividing lines between tool steel and other articles like those described in Commerce's scope. Counsel's emphasis... Going back to Judge Moore's question, in defining the like product, the Commission is directed by the statute to first look at the subject matter, subject merchandise under investigation, correct? Correct. The statute defines domestic like product as a product which is like or in the absence of like most similar in characteristics and uses with the article subject to investigation. And that article subject to investigation, that is Commerce's scope. Hence, the Commission's starting point is always Commerce's scope. And while it doesn't purely rely on parties to raise issues about other products that may come up, as it did in the preliminary determinations here in looking at carbon and alloy steel plate, it does actively solicit their input. And here, parties raised two issues, the X70 plate and tool steel, and the Commission examined whether or not there were clear dividing lines between tool steel... Did you say the supplemental questionnaires were sent out? They were. Initially, respondents misframed the issue. They argued that there was no U.S. production of tool steel, which would not be a domestic like product issue. They subsequently changed their position. They identified possible producers. The Commission then issued questionnaires to these firms, collected data from them, which is the basis for its analysis and its final determination. So is this a case where, for example, the ITC looked at Commerce's scope determination and then simply said we adopt it, we're not going to do anything else? Certainly not, Your Honor. We undertook our own analysis. Again, in the preliminary determination, starting with this overarching question, are there clear dividing lines between carbon steel plate and alloy steel plate? And then for the other issues raised by parties, where they asked for us to define a separate like product, we gathered information on those products and did an analysis of whether there were clear dividing lines between these products and others. Now, to emphasize again, no party asked us to define the like product more broadly than Commerce's scope. Hence, that's why there is no analysis of these other products. What about the argument of an established agency practice? Agency practice. Well, that mischaracterizes like product definitions. These determinations are not binding precedents. They are factual determinations based on the record before the commission. And it's necessary the commission always bases like product definition on the record before it, not on prior definitions, because product characteristics, market characteristics, they're not static. These will change over time. And that was the case in these determinations. When the commission looked at carbon steel plate and alloy steel plate, it noticed that the characteristics of these products had converged over time. Hence, while in past investigations the commission had looked at one or the other, it found that there were not clear dividing lines between these products, and it included both in the single definition of domestic like product. And again, as the Court of International Trade found, prior anti-dumping and countervailing duty proceedings cited by Hitachi addressed different product groupings. So the question at issue here, whether there were clear dividing lines between tool steel and carbon alloy steel plate was never addressed in a prior determination. And as the court noted that there – citation to safeguards investigations is – I'm glad that they finally acknowledged that this is not binding on the commission, but I would argue that it's of limited information at all. This is a different statute. The Trade Act of 1974 versus the Tariff Act of 1930, where anti-dumping and countervailing duty – No, I would appreciate that argument, but it seems to me that there's something there to be said for consistency by the agency in its determination. Certainly, Your Honor. Now, where you may have a different relief that's being sought or a different type of trade action that's been put into place, the domestic industry itself remains the same. I mean, that seems to me to be less dynamic than the other factors. Why would there be a different domestic industry for a safeguard action than for a dumping action? You're talking basically the same producers, the same data. It's a distinct remedy, and they're also distinct terms, Your Honor. The statute defines in safeguards investigations that the commission define a like or directly competitive product. An anti-dumping, countervailing duty investigation is a product like or similar in characteristics and uses. Also different are the criteria that the commission uses to define each of these products. There's some overlap, but there's also differences. And because of the differences in statute, terminology, and criteria, different conclusions, different definitions would be expected and reasonable. And also with the prior anti-dumping, countervailing duty proceedings, I think a key point is that each of these had a different starting point. The scope was different. It did not include the products grouped here. Carbon steel plate, alloy steel plate, and tool steel. Indeed, Hitachi themselves acknowledged various times in their arguments that the underlying investigations were the first time that the commission had looked to this grouping of products. So there could not have been a prior agency practice for them to rely on. The Court of International Trade also confirmed this. I think also informed that Hitachi is citing to SKF, this Court's holding in that, to support its reliance in safeguards investigations. But the holding in that case was that the same terms under the same statute should have the same meaning. And, of course, here we have different terms in different statutes altogether. More informative is this Court's holding in USEC versus United States, where this Court found that different scopes promulgated under different statutory provisions serve distinct purposes and are not controlling on each other as a result. Finally, on Hitachi's point that the commission lacked sufficient data for production facilities, processes, and employees, the commission's investigation of this issue was proper. We issued questionnaires to all firms identified by Hitachi who received responses from four. We followed up with other firms that did not respond and received partial responses from some of them. As we explained in our brief at page 48, Hitachi's characterization of the record that this represented only 12% of domestic tools for production, that's pure conjecture on Hitachi's part. There's no record evidence supporting that. Further, it does not erase the record evidence before the commission that of the four firms reporting to us, three indicated that they produced these products at the same facilities on the same equipment and with the same employees. Unless there's further questions, that concludes my argument. Okay, Ms. Ringel. Thank you, Your Honor. May it please the Court, Brooke Ringel on behalf of Repellent Intervenors. I would first just like to make a few additional points specifically regarding the argument that the ITC assumed a presumption or created a presumption that the domestic-like product should be defined as scope or is defined as scope. The ITC's analysis was a neutral evidentiary examination, and that's most obviously demonstrated by the fact that petitioners themselves had to argue that domestic-like product was coextensive with scope. So the domestic industry and petitioners had to put evidence on the record and make arguments along those lines. If a presumption existed, that would be purely on the respondent to have rebutted that, and petitioners would not have had to make affirmative arguments on that point. Further, this goes to the fact that arguments matter, and the arguments made as to the domestic-like product definition absolutely matter. Counsel for Hitachi has raised the analogy of a domestic-like product being defined as, or excuse me, the scope of an investigation being defined as red balloons and whether the industry itself should be defined as all balloons. Below, both in the administrative proceeding and before the lower court, Hitachi did not argue that the domestic-like product should be defined any more broadly, and there was no evidence on the record for the ITC to have conducted that analysis. Turning to Hitachi's substantial evidence argument, I would just like to note that in the proceedings below, Hitachi challenged the ITC's application of the six-factor test, and the conclusion resulting from that factual analysis is not supported by substantial evidence. It's noteworthy that the court below determined that based on the record facts, the results of the ITC's six-factor test was in fact supported by substantial evidence. Hitachi has abandoned that argument before this court and does not contest the lower court's holding that the ITC's six-factor analysis was supported by substantial evidence. Hitachi does not argue that the six-factor test was not correctly applied. Instead, Hitachi's argument comes down to an allegation that the ITC should have continued its search for information until it found more data helpful to Hitachi's position. That is simply not a basis for remand. Hitachi's dissatisfaction with the certified content of the additional questionnaires it received from ToolSteel producers or the fact that it didn't receive all the responses is not unusual, not unique, and simply not a basis for remand. The court below very astutely noted on Appendix 36, plaintiffs appear to assert that there was substantial record evidence for the finding that ToolSteel constituted a separate-like product but not the finding that ToolSteel is part of a single and domestic-like product. Petitioners' assertions reflect disagreement with the conclusion the commission drew from the available evidence, but that is not a proper basis for remand. The arguments before this court are even weaker and that concludes my comments, unless there are any additional questions from the court. I'm just impressed at how many different issues you hit and I'm convinced that you don't breathe. But thank you for your argument. Let's have the rebuttal. Thank you, Your Honor. Only two brief points for me. First, just one quick excerpt about what we did, in fact, argue with the court despite what opposing counsel suggests. There was no evidence supporting a finding of a single-like product coextensive with the scope of the investigation that includes ToolSteel but does not include the seven excluded groups of cut-to-length plate inclusive of stainless steel within that category. That's just one excerpt. One last brief point, if I might, within the anti-dumping statute. Where does this leave us? Where are we today at the Trade Commission? Currently, there are three completely different definitions of carbon plate, of steel plate, used by the Trade Commission. Completely different. Some include alloy, some include don't, some include various products, some have different exclusions. How can those three different definitions of an industry coexist simultaneously in cases currently proceeding before the Commission? It is because the scope was different in each of those three cases. And this is just one example of scope being unilaterally adopted without regard to any consideration of the industry as a whole and carried forward case by case. That leaves us with petitioners arbitrarily determining scope, the Commission adopting that as industry in cases proceeding on that basis, even as of today. Okay, I thank all counsel for the argument. It was very helpful. This case is taken under submission.